Argued and submitted August 18, affirmed November 9, 2011

## WEYERHAEUSER REAL ESTATE DEVELOPMENT COMPANY,
*Petitioner,*

*v.*

## POLK COUNTY,
Pat Wheeler, Sarah Deumling,
Karen Farmer, and Tremaine Arkley,
*Respondents.*

Land Use Board of Appeals
2011022; A148925

267 P3d 855

Steven L. Pfeiffer argued the cause for petitioner. With him on the brief were Corinne S. Celko and Perkins Coie LLP.

Charles Swindells argued the cause for respondents Polk County and Sarah Deumling. With him on the brief was David Doyle.

No appearance for respondents Pat Wheeler, Karen Farmer, and Tremaine Arkley.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Petitioner seeks judicial review of an order of the Land Use Board of Appeals (LUBA) affirming Polk County's denial of petitioner's request for three property line adjustments. The key dispute is whether petitioner owns four lots and may adjust the property lines between them (as petitioner argues) or whether petitioner merely owns a parcel containing the area of those lots (as the county decided and LUBA affirmed at the urging of the county and a number of intervenors). We review to determine whether LUBA's order was "unlawful in substance or procedure" or unsupported by substantial evidence. ORS 197.850(9)(a), (c). Because we conclude that the lots at issue were vacated by operation of a partition approved by the county and recorded in 1983, we affirm.

We understand that the parties agree on the underlying facts. In 2010, petitioner applied for property line adjustments for an area of land that it owns and that it identifies as four lots—Lots 10, 11, 12, and 13—in the Sheridan View Acres Subdivision. Those lots were lawfully created when the plat of the subdivision was recorded in 1911.

The current status of Lots 10, 11, 12, and 13 depends on the effect of certain actions initiated by petitioner's predecessors in interest during the 1980s.[1] In late 1982, there was an application for a "special exception" "[t]o separate three (3) parcels of $60\pm$, $70\pm$ and $120\pm$ acres from a total holding of $250\pm$ acres in the F/F (Farm Forest) Zone."[2] The applicant sought a "land division" under a county zoning ordinance to divide the approximately 250-acre parcel into the three smaller ones. After notice and a public hearing, the application was approved by the board of county commissioners "on the basis of Section 138.100 (g) of the Zoning Ordinance,"

---

[1] A simplified version of the 1983 "survey map of major/minor partition" and the subsequent "survey map of lot line adjustment" appear in Appendix 1 to this opinion.

[2] Although the words "lot" and "parcel" may be used interchangeably in common usage, the two words had distinct legal meanings at the time of that application, as we discuss below.

which addressed divisions of farm or forest land.[3] As part of that approval, the board of county commissioners noted that a survey of the property was required to be filed with the county clerk.

In early 1983, one of petitioner's predecessors in interest filed a "survey map of major/minor partition," which was approved by the county planning director, the county roadmaster, and the county surveyor. The description on the survey map states, in part, "This Survey was done in order to divide one large parcel into 3 smaller parcels as shown on Map." Those three parcels encompassed an area of land that originally had been platted into over 20 lots, in the 1911 subdivision. Parcel 1—which petitioner now owns—included the area occupied by Lots 10, 11, and 12, as well as two other adjacent lots, Lots 8 and 9.

The 1983 partition survey map, though, does not show any lot lines from the 1911 subdivision plat. It describes Parcels 1, 2, and 3 by metes and bounds, with some references to the 1911 plat, such as calling out the southeast corner of Lot 12, Block 2 Sheridan View Acres. The survey map

---

[3] The record quotes that section of the ordinance as follows:

"(g) The division is for the purpose of separating land which is generally unsuitable for the production of forest products, farm crops and livestock, considering the terrain, adverse soil or land conditions, drainage and flooding, vegetation, location and size of the tract, from other such land or from agricultural or forest land. A division under this subsection, or any dwelling proposed for a parcel resulting from a division under this subsection must meet the standards set out in paragraphs (a), (b) and (c) of subsection (3) of ORS 215.213. No dwelling may be constructed on any parcel resulting from a division under this subsection without first obtaining a conditional use permit under subsection (o) and (p) of Section 138.040 of this Ordinance. Nothing in this subsection prevents establishment of a farm or forest dwelling on a parcel of agricultural or forest land which results from a division of land under this subsection."

ORS 215.213(3) (1981) provided, in part:

"Single-family residential dwellings, not provided in conjunction with farm use, may be established, subject to approval of the governing body or its designate in any area zoned for exclusive farm use upon a finding that each such proposed dwelling:

"(a) Is compatible with farm uses described in ORS 215.203(2) and is consistent with the intent and purposes set forth in ORS 215.243;

"(b) Does not interfere seriously with accepted farming practices, as defined in ORS 215.203(2)(c), on adjacent lands devoted to farm use;

"(c) Does not materially alter the stability of the overall land use pattern of the area[.]"

was recorded. No notation appears to have been made on the original 1911 plat to indicate the vacation of any lots encompassed in the new parcels.

A few days after the partition survey map was recorded, the same predecessor in interest filed a "survey map of lot line adjustment" between the recently created Parcels 1 and 2. The property line adjustment moved the area of Lot 13 from Parcel 2 to Parcel 1 and moved the area of Lots 8 and 9 from Parcel 1 to Parcel 2. Within the area of Parcel 1, the line adjustment survey map depicts, with dashed lines, the internal boundaries between Lots 10, 11, 12, and 13. The map depicts the lines of Parcels 1, 2, and 3 (as adjusted) with solid lines. The solid lines, but not the dashed lines, show the metes and bounds of the area depicted. There is no indication on that map of approval by the county board of commissioners, surveyor, planning director, or other staff. The county found—and petitioner does not challenge the finding—that the county "did not have a formal property line adjustment process in 1983; therefore, a planning application would not have been needed to execute the adjustment." The narrative on the map states that the survey's purpose was "to adjust partitioning" and that the "surveys used were the above partitioning and original plat of Sheridan View Acres."

Some subsequent recorded documents refer to Lots 10, 11, 12, and 13. In April 1983, one of petitioner's predecessors in interest sold Parcel 1. The deed describes the property conveyed both as Lots 10, 11, 12, and 13 and by the metes and bounds of Parcel 1. In 1991, the county vacated some of the roads dedicated in the 1911 subdivision plat. The resolution vacating the roads describes the roads with references to, among other lots in the subdivision, Lots 10 and 12. A notation concerning the road vacation was made on the clerk's original of the Sheridan View Acres plat.

In 2010, petitioner applied for property line adjustments to Lots 10, 11, 12, and 13. The county concluded that the 1983 partition effectively vacated the lots as discrete lots and consolidated them into new parcels, and it therefore denied petitioner's application.

Petitioner appealed to LUBA, which affirmed the county's decision. LUBA reasoned as follows. Property lines

can be eliminated in a variety of ways, including through local regulations concerning vacation or consolidation of lots or parcels, and "the county presumably approved the 1983 partition plat pursuant to its local partition procedures." As ORS 92.234(4)[4] suggests, and under earlier LUBA decisions, *Van Veldhuizen v. Marion County*, 26 Or LUBA 468 (1994), and *Koo v. Polk County*, 33 Or LUBA 487 (1997), a partition to replat a subdivision with local government approval vacates or consolidates subdivision lots. Even if it were possible to have lots "nested" within a parcel, the 1983 partition did not preserve any lots. Nor did the 1983 property line adjustment reestablish the lots; the property line adjustment was not approved by the county, as required for a partition or subdivision, and the purpose of the adjustment was merely "to adjust partitioning," not to reestablish lots. Although the county did not, in its order on petitioner's application, directly address the 1991 road vacation order, that order had no bearing on the effect of the 1983 partition.

Petitioner seeks judicial review. In its first assignment of error, petitioner argues that LUBA misconstrued the applicable law by concluding that the 1983 partition vacated the lots. Petitioner contends that LUBA's analysis is inconsistent with ORS 92.017, which currently provides:

> "A lot or parcel lawfully created shall remain a discrete lot or parcel, unless the lot or parcel lines are vacated or the lot or parcel is further divided, as provided by law."

Petitioner argues that ORS 92.017 does not recognize a partition as a method to eliminate a lot's status as a discrete lot and that the county never undertook any process to vacate or redivide Lots 10, 11, 12, and 13. In petitioner's view, although undeveloped subdivisions may be vacated under a review process in ORS 92.234 and individual lots may be vacated under the replat process of ORS 92.180 to 92.190, no statute authorizes vacation of lots by partitioning. Petitioner argues that the only method of vacating subdivision lots in 1983 was through proceedings under ORS 92.234. Petitioner further argues that the 1983 partition did not "further divide[ ]" the

---

[4] That provision states, in part: "Nothing in ORS 92.205 to 92.245 shall prevent the owner of any lands within an undeveloped subdivision from seeking vacation of such subdivision under city or county vacation procedures * * *."

lots for purposes of ORS 92.017. In petitioner's view, ORS 92.234(4) does not authorize local governments to provide a different process for vacating lots, and, in any event, no evidence in the record shows that the county established such procedures.

Respondents argue that a partition plat, such as the 1983 partition, can be used to redivide property and vacate lots. Respondents also point out that ORS 92.017 was enacted in 1985, after the recording of the 1983 partition. They further contend that LUBA correctly applied its earlier decisions in *Van Veldhuizen* and *Koo* to conclude that ORS 92.234 did not provide the sole method of vacating lot lines and that recording a partition plat has the effect of vacating previous lot lines and creating new parcels. Finally, respondents argue, post-1983 references to lots in Parcel 1 do not show that the lots maintained any discrete legal status.

Although the parties focus on the effect of the 1983 partition, their arguments do not track the statutes governing the division of tracts of land in effect at that time, ORS 92.010 to 92.160 (1981), or the various statutes that then addressed the vacation of subdivisions. We begin our analysis with the then-applicable statutory definitions of some pertinent terms. In part, ORS 92.010 (1981) provided:

"As used in ORS 92.025 to 92.160, unless the context requires otherwise:

"(1)   'Lot' means a unit of land that is created by a subdivision of land.

"(2)   'Major partition' means a partition which includes the creation of a road or street.

"(3)   'Map' means a final diagram, drawing or other writing concerning a major partition.

"(4)   'Minor partition' means a partition that is subject to approval by a city or county under a regulation or ordinance adopted pursuant to ORS 92.046 and that does not include the creation of a road or street.

"* * * * *

"(6)   'Parcel' means a unit of land that is created by a partitioning of land.

"(7) 'Partition' means either an act of partitioning land or an area or tract of land partitioned as defined in this section.

"(8) 'Partition land' means to divide an area or tract of land into two or three parcels within a calendar year when such area or tract of land exists as a unit or contiguous units of land under single ownership at the beginning of such year. 'Partition land' does not include divisions of land resulting from lien foreclosures, divisions of land resulting from foreclosure of recorded contracts for the sale of real property and divisions of land resulting from the creation of cemetery lots; and 'partition land' does not include any adjustment of a lot line by the relocation of a common boundary where an additional parcel is not created and where the existing parcel reduced in size by the adjustment is not reduced below the minimum lot size established by any applicable zoning ordinance. 'Partition land' does not include the sale of a lot in a recorded subdivision, even though the lot may have been acquired prior to the sale with other contiguous lots or property by a single owner.

"(9) 'Plat' includes a final map, diagram, drawing, replat or other writing containing all the descriptions, locations, specifications, dedications, provisions and information concerning a subdivision.

"* * * * *

"(12) 'Subdivide land' means to divide an area or tract of land into four or more lots within a calendar year when such area or tract of land exists as a unit or contiguous units of land under a single ownership at the beginning of such year."

We note that, in 1983, several statutes gave counties authority to vacate subdivisions or parts of subdivisions, *i.e.*, tracts of land containing four or more lots as described in ORS 92.010(12) (1981). First, ORS 92.205 to 92.245 (1981) provided a process for vacating undeveloped subdivisions, which could be initiated by a local government or by a landowner.[5] Second, ORS 368.326 to 368.366 (1981) provided a

[5] Sheridan View Acres was not an "undeveloped subdivision" in 1983. The 1911 plat shows that a company owned the platted land; the 1982 special exception application indicates different ownership of the partitioned land. A transfer of ownership makes a subdivision "developed." ORS 92.225(2)(e) (1981) (providing that

vacation method, not limited to undeveloped subdivisions.[6] Additionally, under ORS 368.011 (1981), counties could supersede, by ordinance, the vacation provisions of ORS chapter 368 and establish an alternative process.[7] Finally,

subdivision is developed if "[o]ne or more lots described in the plat of the subdivision have been sold or otherwise transferred prior to the date of the initiation of [local government review]"). In addition, the 1982 special exception application depicts the presence of a house and barn. A subdivision is developed if "[b]uildings have been or are being constructed upon the land." ORS 92.225(2)(d) (1981). Accordingly, as respondents noted at oral argument, ORS 92.234 was inapplicable to the land at issue in 1983.

[6] ORS 368.326 (1981) provided:

"ORS 368.326 to 368.366 establish vacation procedures by which a county governing body may vacate a subdivision, part of a subdivision, a public road, a trail, a public easement, public square or any other public property or public interest in property under the jurisdiction of the county governing body. The vacation procedures under ORS 368.326 to 368.366:

"* * * * *

"(2) Are an alternative method to the method established under ORS chapter 92 for the vacation of a subdivision."

If those procedures were used to vacate, ORS 368.356(1) (1981) required a county to enter an order or resolution, which ORS 368.356(2) required to

"(a) State whether the property is vacated;

"(b) Describe the exact location of any property vacated;

"* * * * *

"(e) If a plat is vacated, direct the county surveyor to mark the plat as provided under ORS 271.230."

ORS 271.230(1) (1981) required that the order be recorded and be noted on the original plat. Here, it does not appear that a vacation order was noted on the original 1911 plat.

[7] ORS 368.011 (1981) provided:

"(1) Except as otherwise provided in this section, a county may supersede any provision in this chapter by enacting an ordinance pursuant to the charter of the county or under powers granted the county in ORS 203.030 to 203.065.

"(2) A county shall not enact an ordinance to supersede any of the following provisions: This section and ORS 368.001, 368.016, 368.021, 368.026, 368.031, 368.051, 368.705, 368.707, 368.710, 368.720 and 368.722."

In *Billington v. Polk County*, 299 Or 471, 475 n 4, 703 P2d 232 (1985), the court discussed the legislative history of the bill codified as ORS 368.326 to 368.366 (1981). The court quoted extensively from an exhibit that stated, in part, that the new statutory provisions "are similar to vacation procedures for cities; they are an alternative to *county ordinance or charter provision which may be used as an alternative authority.*" *Id.* (quoting Testimony, House Transportation Committee, HB 2051, Mar 10, 1981, Ex A (statement of Bill Penhollow, Association of Oregon Counties) (emphasis added)).

From the record before us, however, it does not appear that the county established an alternative vacation method; no such ordinance was referenced in the 1983 partition.

ORS 275.105 (1981) provided for vacation if a county had acquired all of the lots in an addition, subdivision, or plat. We do not understand the 1983 partition to have constituted an effort to invoke any of those methods for vacation of lots within a subdivision.

We turn to the effect of the provisions of ORS chapter 92 (1981) governing subdivisions and partitions on Lots 10, 11, 12, and 13. All subdivisions and partitions were required to comply with ORS 92.010 to 92.160. ORS 92.012 (1981). Under those statutes, counties had significant authority over subdivisions and partitions. *See Ogan v. Ellison*, 297 Or 25, 32, 682 P2d 760 (1984) (stating that purposes of ORS 92.044 and ORS 92.046 "are numerous, but all relate to providing counties and cities with effective tools for the prevention of undesirable partitioning of land"). Counties had authority to approve plans, maps, and plats for subdivisions and major partitions of land. ORS 92.042(2) (1981). Counties were required to adopt ordinances regarding tentative plans and plats of subdivisions and tentative plans and maps of major partitions, ORS 92.044(1) (1981), including establishment of "the form and contents of maps of major partitions for filing upon approval with the county recording officer," ORS 92.044(1)(b) (1981). Counties also could adopt ordinances regarding minor partitions. ORS 92.046(1) (1981). All such ordinances were required to implement the county's comprehensive plan. ORS 215.050(2) (1981) ("Zoning, subdivision or other ordinances or regulations and any revisions or amendments thereof shall be designed to implement the adopted county comprehensive plan."). Before a plat or a map of a major partition could be made and recorded, the applicant had to make a written application, accompanied by a tentative plan; the county had to approve a tentative plan before it could consider approving a plat or map. ORS 92.040 (1981); *see also* ORS 205.130(1) (1981) (providing that county clerk shall have custody of and safely keep and preserve "all maps, plats, contracts and powers of attorney affecting the title to real property"); ORS 209.070(2) (1981) (providing that county surveyor shall "[n]umber progressively all surveys received and state by whom and for whom made").

The issue here is whether, under those statutes, a county's approval of a partition application and the subsequent recording of a partition map had the effect of reconfiguring units of land and vacating lot lines that were previously created by a recorded plat. Concluding that the 1983 partition did have that effect, LUBA cited its *Van Veldhuizen* decision, in which it determined that recording a county-approved partition plat effectively vacated the lines between two previous parcels. Respondents contend that LUBA's analysis was correct. As noted, petitioner argues that LUBA erred, because ORS 92.017, enacted in 1985, preserves lots as discrete units of land and because the lots were not vacated pursuant to the process described in ORS 92.234 for undeveloped subdivisions.

We conclude that, under the statutes applicable at the time of the 1983 partition, a partition had the effect of vacating previous lot lines, at least where, as here, the partition map does not indicate the continued existence of the lots that were partitioned. Under those statutes, a parcel and a lot were each "a unit of land," created by either a partition (parcels) or a subdivision (lots). ORS 92.010(1), (6) (1981). To "partition land" was to divide "an area or tract of land" that "exists as a unit or contiguous units of land under single ownership" into two or three new units, or parcels. ORS 92.010(8) (1981). A partition, then, could divide an owner's single existing parcel or lot, or it could divide an owner's multiple contiguous parcels or lots, into two or three parcels. As examples, under the statutes, a single lot could be partitioned into two parcels, or five lots could be partitioned into three parcels. If multiple lots were redivided into parcels, there was no requirement that the partition of the lots preserve the lines of the previous lots in any way. It is also difficult to imagine that the legislature intended the previous lot lines to survive such a process, creating a spider web of overlapping lots and parcels. Given the authority that counties had in 1983 to approve divisions of land and given that the processes of dividing land were intended to create new units of land, we conclude that the legislature did not intend to require counties to go through a separate, additional process to

vacate lots when approving a partition of those lots into new parcels.[8]

Here, the 1983 partition consolidated multiple lots into three parcels, as shown on the recorded partition survey map. Although the partition apparently did not cut through the previous lot lines, nothing in the partition survey map indicates that any of the lots were intended to be preserved. When Parcels 1, 2, and 3 were approved by the county and recorded, the new legal descriptions of those parcels effectively replaced the lines of the previous units of land. Thus, the 1983 partition vacated the lots contained in Parcels 1, 2, and 3. Although the subsequent 1983 lot line adjustment changed the configuration of Parcel 1 and depicted Lots 10, 11, 12, and 13 within Parcel 1, those lots already had been vacated as a result of the 1983 partition. A lot line adjustment could not restore the lots, even if the then-owner of Parcels 1 and 2 intended the adjustment to have that effect.

We next consider whether, as petitioner contends, ORS 92.017 prevents the 1983 partition from vacating Lots 10, 11, 12, and 13. Because ORS 92.017 was enacted after the 1983 partition was approved and recorded, thereby vacating the lots, we must determine whether the legislature intended ORS 92.017 (1985) to restore the lots' status as discrete lots after they were vacated by the 1983 partition. As noted, that statute provided that a lot shall remain a discrete lot unless the lot lines "are *changed or* vacated" or the lot "is further divided, as provided by law."[9] (Emphasis added.)

During the same session in which ORS 92.017 was enacted, the legislature enacted new provisions regarding replatting of land. Under ORS 92.180 (1985), counties were authorized to approve a replat. As defined in ORS 92.010(10) (1985), a "replat" includes "a final map, diagram, drawing of the reconfiguration of lots and easements of a recorded plat and other writings containing all the descriptions, location, specifications, dedications and provisions and information

---

[8] We are not called upon to decide, and we expressly do not decide, whether the same is true under the current statutory scheme.

[9] The italicized text was deleted in 1993. Or Laws 1993, ch 702, § 2.

concerning a recorded subdivision." Pursuant to ORS 92.185 (1985), once the replat was approved by the appropriate reviewing agency or body, it "will act to vacate the platted lots and easements within the replat area with the following conditions[.]"

The legislature appears to have understood the replat statutes to resolve conflicting interpretations of previous laws concerning the vacation of lot lines—namely, whether approval of a replat automatically vacated lot lines or whether an additional vacation process was required in conjunction with a replat. *See* Staff Measure Analysis, Senate Committee on Government Operations and Elections, HB 2547 (1985) (stating that jurisdictions had been split regarding whether replatting automatically vacated lot lines or whether separate vacation process was required); Testimony, House Committee on Housing and Urban Development, HB 2547, Mar 26, 1985, Ex C (statement of Dennis Fantz) (supporting bill on behalf of Oregon Association of County Engineers and Surveyors and on behalf of Multnomah County; stating that bill "would cause a consistent state-wide application for replatting recorded subdivisions unlike the now varied interpretation of the statutes"). Speaking on behalf of the Oregon Association of County Engineers and Surveyors, which had requested the bill, one witness stated that the bill would clarify the effect of a replat on lot lines; explaining the need for the bill, he stated that there was disagreement about whether replatting would eliminate lot lines when, for example, a landowner owned three lots and wanted to reconfigure the property into two larger units. Tape Recording, House Committee on Housing and Urban Development, HB 2547, Mar 26, 1985, Tape 61 (statement of Fritz Ingram). In response to a question about the nature of a replat, the same witness explained that to combine two lots and get rid of a lot line, a replat process would be needed to provide a new legal description of the combined unit of land. *Id.* at Tape 62 (statement of Fritz Ingram). Another witness concurred that lots could be combined by replat. *Id.* (statement of Osburn Shaw).

In 1985, then, the legislature understood that, by enacting the replat statutes, it was approving a process

already in use by some local governments, whereby combining lots to redivide land into parcels would vacate prior lot lines. In light of that legislative approval, it seems highly unlikely that the legislature simultaneously intended the adoption of ORS 92.017 (1985) to restore lots that had been vacated when the lots were consolidated by a partition. LUBA did not err by rejecting petitioner's argument that ORS 92.017 (1985) prevented the 1983 partition from having the effect of vacating Lots 10, 11, 12, and 13. Given that under the governing statutes in 1983, a partition had the effect of vacating previous lot lines, LUBA also correctly determined that the review process for undeveloped subdivisions in ORS 92.234 did not provide the sole method by which lot lines could be vacated.

In its second assignment of error, petitioner argues that LUBA erred by failing to remand for the county to consider and address evidence regarding the 1991 road vacation order. LUBA concluded that there was no need to remand for findings addressing that order. Petitioner argues that the 1991 road vacation order is evidence that the lots were not vacated in 1983, because the order would have been unnecessary had the Sheridan View Acres subdivision been vacated under the review process in ORS 92.234, which also provides for the vacation of land dedicated to public use within an undeveloped subdivision pursuant to ORS 92.234(3). As explained above, however, the lots were vacated by the 1983 partition, not by the ORS 92.234 review process. Petitioner further argues that the 1991 road order's reference to Lot 10 establishes that Lot 10 must still have existed after the 1983 partition. Petitioner cites no authority for that proposition, and we are aware of none. Instead, it appears that the reference to the former Lot 10 was a historical reference as a matter of convenience. LUBA did not err by declining to remand for the county to consider the effect of the 1991 road vacation order.

Affirmed.

# APPENDIX 1

**1983 Survey map of major/minor partition.**